UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____

|  |  |  |
|---|---|---|
| SHERITA HAYES, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| SONABANK, now known as Primis Bank | ) | Civil No. 3:21-cv-230 |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT

**COMES NOW** the Plaintiff, Ms. Sherita Hayes ("Hayes"), by and through undersigned counsel, and for her Complaint states as follows:

### I. PARTIES

1. Sherita Hayes is a 41-year-old African American female residing in Maidens, Virginia. Hayes was employed by the Defendant Sonabank in its Retail Bank division in Richmond, VA office from May 2018 until the date of her termination on March 4, 2020.

2. The Defendant Sonabank is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Glen Allen, Virginia. On March 31, 2021, Sonabank became Primis Bank – and will be referred to hereafter as "the Bank."

### II. JURISDICTION AND VENUE

3. This Court has jurisdiction over the matter pursuant to 28 U.S.C § 1331. This case presents federal questions of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000(e) *et seq*. ("Title VII") (race; retaliation), 42

U.S.C. § 1981 ("Section 1981") (race; retaliation), 29 U.S.C. § 206(d) ("Federal Equal Pay Act") (gender; retaliation), and VA Code §40.1-28.6 ("Virginia Equal Pay Act") (gender).

4.   Venue is proper in the Court under 28 U.S.C. § 1391(b)(1) and (d) because Plaintiff resides in Maidens, Virginia, and Defendant is a corporation organized and existing under the laws of the Commonwealth of Virginia and has its principal place of business in Glen Allen, Virginia; and under (28 U.S.C. § 1391(b)(2)) because a substantial part of the events or omissions regarding the Plaintiff's claims occurred in Richmond, Virginia, where Plaintiff was employed at Defendant's office location, until such time that Defendant unlawfully terminated Plaintiff as described more fully below.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.   On July 7, 2020, Hayes filed a *Charge of Discrimination* with the Equal Employment Opportunity Commission ("EEOC") Richmond, Virginia field office (**Ex A**).

6.   On January 6, 2021, the EEOC issued its decision along with a *Notice of Right to Sue* letter (**Ex B**).

7.   On April 5, 2021, within the 90-day timeframe to seek judicial appeal of the EEOC's decision, Plaintiff filed the Complaint with this Court.

8.   There are no administrative exhaustion requirements under Section 1981.

9.   There are no administrative exhaustion requirements under the Federal Equal Pay Act.

10. There are no administrative exhaustion requirements under the Virginia Equal Pay Act.

## IV. STATEMENT OF FACTS

11.     Hayes is a United States citizen and was born and raised in Glen Allen, VA.

12.     Hayes attended college at Virginia Commonwealth University and transferred to James Madison University where she obtained Autism Spectrum/Communications certificate in 2017.

13.     From around 2010 until March 2018, Hayes worked at Wells Fargo as Vice President, Program Manager until a reorganization left Hayes without a position in her region.

14.     During her last year with Wells Fargo, Hayes' former supervisors wrote raving recommendation letters that document Hayes' strong work ethic and willingness to help others, partner with team members, and accommodate new requests for unexpected work.

15.     When a Branch Manager position at a local Sona Bank came open, Hayes jumped at the opportunity to obtain gainful employment and have a positive impact on her community.

16.     On April 25, 2018, Hayes interviewed for the Branch Manager position at Sona Bank, and was subsequently offered the position of Branch Manager for the Midlothian Branch.

17.     Hayes received great praise from her supervisor, Paul Bishof (white, male), in her 90-day review for the period of May 14, 2018 to August 14, 2018, where she received the rating of "Above Expectations." Bishof wrote in his evaluation regarding Hayes: "It was expected Sherita would network effectively […], and she has exceeded expectations. […] Overall, Sherita has been a great addition and we are thrilled to have her on the Sonabank team."

18.     Hayes was then offered a promotion on or about September 2018 and was promoted to the position of Relationships Manager – this was an exempt position with no set workday hours.

**A.  Hayes Learns That a White Male in Same Position Was Being Paid Significantly More**

19.     In September 2018, Plaintiff learned that Jeff Bracewell ("Bracewell") in the same role and position as Hayes at Sona Bank, had an appreciable higher annual salary and was thus making significantly more money than her.

20.     Bracewell is a white male.

21.     Bracewell held the title of Vice President while Hayes held the title of "Relationship Manager," even though they were carrying out the exact same job duties.

22.     The only differences between Bracewell's and Hayes' roles and responsibilities at the bank were their gender and race.

**B. Hayes Engages in Protected Activity; Asks for Equal Pay for Equal Work; Told African Americans "Treated Differently Here" by Head of Human Resources**

23.     In October 2018, Hayes approached her direct supervisor, Jeff Culver (white, male), and the Director of Human Resources, Shanita Byrd (African American, female), to discuss the pay and job title discrepancies.

24.     In this October 2018 meeting, Hayes was told by Culver that the VP title change and a pay increase of $6,000 would follow in the first quarter of 2019 when performance appraisals were delivered in March.

25.     Immediately after the October 2018 meeting, Byrd pulled Hayes aside and, while rubbing the back of her hand to indicate the color of her (and Hayes') skin, told her that "we" are "treated differently here" and not to push it because "the board members are stuck in their ways."

26.     The board members to whom Byrd was referring were: Joe Shearin (white, male), Georgia Derrico (white, female), R. Roderick Porter (white, male).

27.     In January of 2019, despite the promised increase in salary of $6,000, Hayes received a pay increase of $3,000.

28.     This left Hayes still earning significantly less than her white male peer, Jeff Bracewell, who was performing the exact same job duties and responsibilities.

**C. Hayes Told to Stay in her Lane After Advocating for Diversity Training; Harassment Ensues**

4

29.     Between January and March of 2019, Hayes regularly emailed Byrd about bringing in a diversity trainer for the bank's employees and the Board.

30.     Hayes' emails went long unanswered or were otherwise dismissed.

31.     In March of 2019, Hayes sent a text message to her coworker, Jossie Arroyo (white, female), expressing concern about the Defendant's lack of diversity/inclusion training. Hayes told Arroyo about how when she (Hayes) asked HR if they could have diversity/inclusion training; the response she received when asking for this training was to stay in her lane and was told by the Director of HR that: "The Board doesn't have a taste for *that type* of training here."

32.     Hayes spoke often in meetings and worked diligently to get Community Reinvestment Act ("CRA") efforts (minority improvement activities for Community Reinvestment Space) in place for the Bank to help communities of color and underserved communities.

33.     The Bank's public filings revealed how the bank failed in Community Reinvestment/service efforts.

34.     Her comments in meetings regarding the CRA efforts were treated just as her prior emails on the subject of diversity training.

35.     In March of 2019, Hayes began calling more and more attention to the overt and blatant disregard from the Bank on treatment of minorities. She did this in meetings with her leadership, and in emails with Byrd regarding the company's culture and vision statement.

36.     Hayes' supervisor, Culver, after much encouragement, started to give Hayes a voice (albeit a small voice) to try and implement change in the CRA. Culver instructed Hayes to reach out to Ann-Cabell Williams (white, female), to work with her on brainstorming ways to improve CRA and putting together a proposal based on Hayes' and Williams' ideas.

37.     Hayes followed her supervisor's instructions and reached out to Williams, seeking to meet to brainstorm ways to improve the CRA and to prepare a proposal to subsequently present to Culver.

38.     On March 26, 2019, Hayes and Williams met to discuss the CRA.

39.     Following the meeting with Williams, Culver informed Hayes that Williams and two other coworkers, Julie Hill (white, female) and Michelle Hastings (white, female) complained to him that Hayes was doing too much and that she needed to "back off" and "stay in [her] lane."

40.     Culver instructed Hayes to reach out to Williams, smooth the waters, and let Williams know Hayes would stay in her lane.

41.     Hayes again followed her supervisor's instructions and emailed Ann-Cabell Williams on April 9, 2019, and apologized to Williams for "overstepping" her bounds (despite Culver previously instructing Hayes to engage with Williams to try to improve the CRA) and ensured Williams that she (Hayes) would be "staying in [her] lane."

42.     To this, Williams responded *thanking Hayes* for agreeing to stay in her lane, and then questioned Hayes' other activities in the bank in a curt way that Hayes found to be offensive and hostile.

43.     Hayes felt like she was put in a corner and told to shut-up and that her skills and experience did not matter; she felt she was not being viewed as an asset based on her work – rather her ideas and suggestions were ignored, and her opportunities to collaborate were diminished  due to her race.

44.     Throughout 2019 and into 2020, multiple times per month Hayes would be told she was "different" by her white coworkers.

6

45.     In late April 2019, Hayes was approached by a colleague, Julie Hill (Senior Vice President, POWER Program; white, female), and told that she (Hill) and a few others noticed that Hayes was having a hard time fitting in. Hill stated, "I know you're having a hard time fitting into the culture here. It's just best you watch how you communicate and watch your tone."

46.     Hayes was confused by this, as her tone and manner of communication when employed with Defendant were not inappropriate in any regard or respect.

47.     In this late April 2019 meeting, Hill condescended Hayes, by saying "Listen, Honey…I have some great personality cards I think would be good for you! I got these just for you! It will help teach you your communication style, and then you can understand mine." Approximately eight to ten of these personality cards were located on the desk in front of them.

48.     Hill picked up the red personality card and explained that she (Hill) was a go-getter, usually gets her way, and that she's competitive. Hill read off the traits on the red card: competitive, attention, winning, spontaneity.

49.     Hill then picked up the green personality card and commented on those traits as she set the card on the table. Hill informed Hayes that she (Hayes) had the green card traits.

50.     Hill then proceeded to place the red card on top of the green card and told Hayes that she (Hill) is the stronger personality and could see how it would be difficult for Hayes.

51.     Hayes found this to be racially motivated, threatening, gaslighting, demeaning, and insulting.

52.     Upon Plaintiff's information and belief, Hill had obtained or received these personality cards from one of Defendant's business customers and based on Hayes' interaction with Hill during this meeting, it appeared to Hayes that Hill had discussed Hayes with this client.

53.     Hayes was disturbed and mortified that Hill would speak negatively about her to customers of the Defendant and tarnish her reputation in the community like this.

54.     Hayes did not report to Hill within the Defendant organization, nor had Hayes asked Hill for any advice. Hill had no authority, responsibility, or business need to discuss Hayes' work-related issues or performance with others, including with persons outside of The Bank.

55.     Hayes felt she was being harassed and discriminated against because she was the only African American at that senior level.

56.     Upon information and belief, Hill did not approach Hayes' non-African American peers and discuss or evaluate their personalities with personality cards and speak to them in a similarly harmful or threatening manner.

**D. Hayes Engages in Further Protected Activity; Reports Discrimination and Harassment to Supervisor; Defendant Takes No Action**

57.     Following this Hill-Hayes late-April interaction, Hayes called her supervisor, Culver, to complain about the discrimination and harassment that she reasonably perceived to be occurring.

58.     Culver told Hayes he was shocked that Hill would do that.

59.     However, no corrective measures or other remedial actions were done after Hayes so notified Culver. In that regard, Hayes' complaint was not passed on to HR, nor was it investigated.

60.     Hayes spoke with a coworker, Josie Arroyo (white, female), about the harassment. Arroyo shared with Hayes that Hill and Hastings told her (Arroyo) that Hayes "is just *different* from us. She is uppity and just needs to stay in her lane." Arroyo advised Hayes that she (Arroyo) told Hill and Hastings that she (Arroyo) didn't want to hear it.

61.     Beginning in April/May of 2019, Hayes began received daily harassing phone calls questioning her job activities from Hastings, Hill, Shearin, and Williams.

62.     The harassment became so severe and pervasive that it impacted Hayes' ability to do her job.

**E.  Hayes' Ability to Perform Job Duties Severely Impeded by Harassment**

63.     None, not a single one, of Hayes' sponsorship requests—at least 8—were approved by Hastings who was Chief Officer of Marketing in charge of approving such requests.

64.     On one occasion, Hayes' request to sponsor a major event for outreach in the minority community—the 2019 Mayors' Masked Ball hosted by the United Negro College Fund (UNCF) Virginia—went ignored despite multiple follow up inquiries from Hayes to her leadership.

65.     Sponsorship events of the Defendant that were held for predominately white organizations were seldom (if ever) ignored.

66.     In face-to-face meetings, Hastings led Hayes to believe that the UNCF sponsorship request would be granted. However, in the end, despite having been led to believe the bank would sponsor the event, she was ignored. With the deadline looming, Hayes was left with no choice but to pay the $3,500 out of pocket. This event was essential to attend in order for Hayes to do her job.

67.     Hill and Hastings would tell Hayes at least weekly, if not daily, that they "only support those who support us."

68.     From January 2019 to January 2020 Hill and Hastings would unabashedly tell Hayes that they (Hill and Hastings) had no interest in supporting the African American community.

69.     By direct observation over multiple instances and occasions, Hayes observed that the Bank did not treat white and black based customers and businesses fairly; it was evident that

9

only requests for sponsorship of white customers and businesses would be approved. There was no set process on how to determine which sponsorship requests to grant, the decision was left up to the very individuals who were harassing Hayes pervasively for being African American; seeking a more diverse and inclusive work environment; and pursuing sponsorships of minority-based customers and businesses.

70.     Hayes would send emails to Hastings to approve her sponsorship requests for her minority small business clients and non-profits and Hastings would ignore Hayes' emails, thus causing Hayes to lose business and look incompetent in front of her business clients. Hayes felt this was done purposely to tarnish her reputation and credibility in the community.

71.     Hill and Hastings stopped calling and partnering with Hayes when she started speaking up about the lack of professional courtesy extended to herself (and minority-based customers and businesses).

72.     After Hayes began to push for diversity training and inclusion of a more diverse clientele, she was no longer invited to key networking events that were essential to doing her job and being visible in the company and community. This significantly affected Hayes' ability to appropriately network, solicit, and obtain potential clients and businesses as part of her job title and function.

73.     Events that Hayes would normally attend with the CEO, Hastings and Hill were no longer added to Hayes' calendar.

74.     Patricia Gallagher mentioned to Hayes several luncheon events that Gallagher attended and asked why Hayes did not join them. Hayes told Gallagher that Hastings and Hill did not invite her, even though Hayes was on the development team.

75.     All of the non-African Americans attended, but Hayes, the only African American on the team, did not even receive underlying invitations and thus did not attend.

76.     It was no surprise to Hayes when the Bank received a low rating from the CRA examiners in spring of 2019.

77.     The Bank scored low in the area of financial literacy for underserved communities in the last audit (around 2017), and there was a big push internally to act quickly and report anything one could dig up relating to this area of weakness. At the time, Angela Rowe (Director of Compliance; white, female), met with Hayes about the CRA and how the Bank was at risk to fail or rate low again in the area.

78.     Upon information and belief, the Bank reported false activities during the CRA audit to reflect that it was fulfilling the area of financial literacy for underserved communities.

79.     Even still, Defendant received low scores.

80.     Given the Defendant's conduct toward Hayes', and its lack of genuine fairness in providing the same or similar level of time, attention, outreach, and focus on minority-based customers and businesses to white customers and businesses, the CRA's low rating of the Bank ultimately did not come as a surprise to Hayes.  That is in part why she was working with Culver to help improve the Bank's positioning in that regard and avoid negative reporting that the Bank was failing to meet the needs of underserved communities, especially communities of color.

### F.   Hayes Complains of Race Discrimination to CEO; Laughed at and Brushed Off; Told to Stay in her Lane

81.     In August of 2019, shortly after enabling Hayes to have more of a voice on CRA activities, Jeff Culver was terminated.

82.     From August to September 2019, Joe Shearin (CEO and one of three Sonabank board members; white male) was Hayes' direct supervisor.

83.     In August 2019 Hayes and Shearin met for the first time one-on-one in Shearin's office.

84.     In the meeting, which lasted about 30-40 minutes, Shearin was cold and disengaged.

85.     Hayes and Shearin sat at a large, round conference table where he let Hayes know how long he has been in the business. It became clear to Hayes that this was not a meeting wherein Shearin was trying to get to know her.

86.     In an effort to prove herself worthy, Hayes handed Shearin her resume and letters of recommendation.

87.     Shearin set the resume and letters of recommendation aside without even glancing at them, looked at Hayes in the eyes, and in a cold voice told her, "I've heard some background about you. I won't say if it's good or bad, but I've heard!" He laughed.

88.     Hayes told Shearin, "I realize there are some at this company who do not care for me—given your leadership thinks I'm uppity and need to stay in my lane."

89.     To this Shearin merely cackled. He did not dispute that the leadership expressed Hayes was "uppity"—a highly offensive and racist term used to describe people of color who speak out against discrimination.

90.     Hayes then shared with Shearin her ideas on how to improve the lack of diversity and inclusion at the company, and also how to obtain more engagements and transactions with minority-based customers and businesses. Hayes stated that, to her dismay, HR represented to her that the board did not feel diversity and inclusion was of importance.

91.     Hayes also shared with Shearin her concerns that the marketing strategy for the SonaBank Women in Business program did not offer much incentive for women of color or women from underserved backgrounds or communities.

92.     Hayes told Shearin that there was a need for more advancement opportunities for minority employees within the bank.

93.     Hayes asked Shearin how she could help improve the company in the area of diversity.

94.     Hayes also shared with Shearin that she felt she was being treated unfairly due to her race, and explicitly mentioned the "uppity" comments, and being told to stay in her lane; she shared that the culture at the Bank was toxic and lacked diversity and inclusion.

95.     To Hayes' complaints of race discrimination and hostile work environment, Shearin stated that he's been in the business for many years and that he was only concerned with bringing in profits and pleasing the board—"not being something we're not."

96.     Shearin told Hayes to leave "that" to the big banks, that she was at a "community bank" now.

97.     Shearin brushed off Hayes' complaints and said that he didn't "want to get involved in *those* issues."

98.     Shearin chuckled at Hayes and asked her how she was going to bring in referrals, shutting down any further discussion on her complaints.

99.     Shearin explicitly told Hayes in this meeting that she needed to be out in the community "having fun" because "[you] can't be sitting up in the branch if you're in the business of business development."

100.    Hayes felt she had no one to turn to regarding this discrimination. Not Human Resources, not her supervisor, not the CEO or the Board.

**G. Hayes' New Supervisor, Executive Vice President, Continues Harassment and Discrimination**

101.    In September 2019, Barry Almond (executive VP and regional sales manager; white male) became Hayes' direct supervisor.

102.    Upon Almond's arrival he personally reached out to every single one of his subordinates on the team by email and phone to set up one-on-one meetings. Every subordinate, that is, but Hayes, the only African American.

103.    On October 9, 2019 Hayes and Almond were both in attendance at the Tappahannock meeting, a road-style meeting for Almond to meet with branch managers and partners; Hayes attended to have an opportunity to meet Almond in person.

104.    Out of a total 20 participants, Hayes was the only African American in attendance.

105.    At one point during the Tappahannock meeting, Hayes was in a room with 15-20 people, all of whom were white except for herself, and Joe Shearin made a joke about bankers being a pain to work with. To this joke regarding bankers, a branch manager (white, female) stood up, said she was upset, and that Shearin "may as well tie a noose around my neck and hang me from a tree right now!"

106.    Hayes' eyes filled with tears as the room filled with laughter.

107.    Hayes saw Almond and Shearin laughing; she was humiliated.

108.    Also during the Tappahannock meeting, Almond reached out personally to every Relationship Manager on the team except for Hayes. In fact, Almond ignored her for the entire meeting, though he knew who she was (he was her supervisor).

14

109.     It was at this meeting that Hayes finally met Almond, though it was not in the same one-on-one capacity her non-African American coworkers were afforded. At the end of the Tappahannock meeting, after being ignored for the entirety of the meeting by her new supervisor, Hayes walked up to Almond to introduce herself.

110.     Almond told Hayes that he had heard a lot about her (thus, confirming that he did know who she was and was intentionally ignoring her). Almond's tone was cold. Hayes asked if they could schedule a one-on-one meeting. Almond agreed and they met on November 26, 2019.

**H.  Hayes' Car Accident, Absence from Work**

111.     On November 19, 2019 at around 5:30pm, Hayes was in a car accident on her way to meet a customer and was transported to St. Mary's Hospital that evening. The following day, November 20, 2019, Hayes was unable to report to work and notified her manager, Almond, at 9:41am via email.

112.     Hayes did not notify anyone else at the bank prior to her 9:41 am email to Almond.

113.     Almond responded to Hayes' email that he was "sorry to hear" about her accident and inquired if there were any customers who needed attention in her absence. His response did not mention Hayes' absence from work, nor her method of notifying him (her manager).

**I.  Hayes Reports Discrimination and Harassment to New Supervisor, Almond; Concerns Dismissed without Investigation or HR Report**

114.     On November 26, 2019, Hayes met with Almond for the first time, face-to-face and one-on-one.

115.     In this meeting, which lasted about 30-40 minutes Almond said he wanted to know about Hayes' background and asked her, "Which side of town are you from…?"

116.     Almond and Hayes discussed the Hayes-Shearin August meeting, where Hayes had reported race discrimination within the company. Hayes told Almond that there were ups and

15

downs within the Bank but that she was excited and hopeful for a shift in work culture under his leadership. To this Almond responded by letting Hayes know he was *very* good friends with Shearin, and that they had discussed Hayes.

117.    Hayes told Almond about her extensive background in both business development and community relations working with under-served and underprivileged communities.

118.    Hayes told Almond that she saw there was a lot of room for improvement with regard to diversity and inclusion.

119.    Almond asked for an example, and Hayes shared with him the noose joke a colleague made during a meeting (which he was in) just a few weeks prior. Hayes told him it made her incredibly uncomfortable, that she did not like it, and then she told him about other similarly insidious incidents--such as being told to stay in her lane after requesting diversity trainings and advocating for Greg, an African American banker who was passed over for a promotion (he was not even given an interview).

120.    Hayes told Almond that the only minority banker in this branch was passed over, and that she has known Greg for years and that he is well qualified to at least get an interview. When Hayes finished explaining all of this, Almond dismissed her concerns by saying, "Wow! It sure does seem like you have quite a list for me!" Almond never apologized for the noose comment. He also did not address the fact that all of her concerns went unanswered by Shearin.

121.    In this November 26, 2019 meeting, Almond did not mention Hayes' car accident, nor her absence from work, nor her (or the Bank's preferred) method of notifying the Bank when she would be late or absent for work.

122.    Almond also did not bring up anything related to Hayes' participation (or lack thereof) in Kasasa week (later relied on by the Bank as one of the bases for Hayes' termination).

**J.   Hayes' Blindsided by Supervisor; Accused of Attempting to Steal $10.00 from Bank**

123.    On or about January 9, 2020, Almond emailed Hayes his desire to meet with her and speak about market strategy and activities relating to growing the business.

124.    On or about January 10, 2020 Almond and Byrd went to Hayes' office to discuss what Hayes believed to be market strategy and activities relating to growing the business. Hayes was excited to meet and discuss and share ideas.

125.    However, this is not what Almond and Byrd wished to discuss. Rather, Almond stated that he was dissatisfied with Hayes' sales performance and that she was the lowest producing member of the Relationship Development Team for the 3rd quarter of 2019.

126.    Hayes, however, was in a Relationship Management role, and was unaware of any sales expectations. Hayes' job in Relationship Management was to promote the brand and maintain clientele.

127.    Hayes asked Almond to clarify how he determined her "sales" numbers to be unsatisfactory. Almond did not offer an explanation, but rather changed the subject to a mileage report that was incorrectly filled out.

128.    The mileage report (submitted by Hayes for travel reimbursement), which Hayes allegedly incorrectly filled out, was "off" (i.e. "over") by about $10.00.

129.    Hayes became visibly upset and explained that she was shocked and embarrassed that both Byrd and Almond would show up to confront her (Hayes) over a mileage report being a mere $10.00 off. Hayes told Almond and Byrd that she did not want the reimbursement check at all.  She was insulted that it was suggested she was trying to cheat the Bank out of $10.

130.     Byrd, however, insisted that Hayes accept payment. Hayes apologized for rushing to complete the mileage report and consequently, miscalculating the amount. Hayes assured Byrd and Almond that this would not happen again.

131.     Indeed, it did not happen again, for Hayes never filled out a mileage report after this incident; she was terrified that she would be terminated for a low-level offense as a poorly disguised excuse for getting rid of the only African American person on the leadership team.

132.     Hayes then asked Almond why it was necessary for Byrd, the Chief of Human Resources, to join Almond in asking about an honest mistake on a mileage report. Almond told Hayes that, "This is how we do things around here."

133.     There was no policy or practice of bringing in human resources to join a meeting between an employee and his/her supervisor to discuss an error on a mileage report when the amount was so insignificant, e.g. $10.00.

134.     Byrd explained that she was a witness, and that Hayes should email her mileage reports directly to Byrd in the future to avoid any confusion.

135.     There was no policy or practice of requiring an employee to email future mileage reports to human resources following an insignificant error on a prior mileage report.

136.     Unprompted, Almond exclaimed at Hayes: "It seems like you're just going through the motions and you don't want to be here!"

137.     Hayes told Byrd and Almond that she felt targeted and was being treated unfairly; that she knew other bank employees had gotten into Almond's head and tarnished his perception of Hayes without him first getting to know her.

138.     Hayes was told by Byrd and Almond to speak up more and they would advocate for her.

18

139.    This was perplexing to Hayes, as she had been "speaking up" from the beginning and was consistently told to stay in her lane and to back off, and Byrd and Almond were aware of her complaints related to this behavior.

140.    Hayes told Almond and Byrd that she felt there was an unprofessional and unfair work culture where she felt targeted. Hayes told Almond and Byrd that she felt she was being treated unfairly, bullied, harassed, and discriminated against due to her race. Hayes discussed the following incidents in addition to the above:

    a.  That Gregory Brown (Hayes' African American male coworker that worked with the branch location) confided in her that Joe Shearin humiliated him and embarrassed him in front of his manager, Jason Williams (white, male). Shearin told Williams, "Jason, you make sure you keep Greg in line!" Hayes shared that Brown had also confided in her that he didn't think that the company treated minorities fairly. Hayes shared how Brown came to her upset that he applied for a branch manager role, and the job was given to Williams (a young white male with less experience than Brown). Brown was not given reasons as to why he was not given a chance to interview when he met **all** of the required qualifications.

    b.  That Josie Arroyo informed Hayes that two white women in Senior Executive roles (Julie Hill and Michelle Hastings) told her that Hayes did not belong there, and that Hayes was "one of those uppity ones" and then "she's just different from us." They also told Arroyo that Hayes, "need to stay in her lane."

    c.  That there was a lack of diversity training at the Bank and that when Hayes asked if they could bring diversity and inclusion training to the Bank, Byrd told

19

her there was no desire to have "that type" of training from upper-level management.

d. That because of the disregard around diversity, the Bank is complicit in allowing discrimination.

e. Hayes brought up the October 9 Tappahannock meeting where Almond and Shearin allowed a white woman in a staff meeting to say, "You may as well tie a noose around my neck and hang me from a tree right now!" Hayes reminded Almond that she had complained to him about this noose comment back in November 2019 and that nothing was done.

f. Hayes shared how she endured racial innuendos from coworkers in the branch and gave an example: During a conversation about Meghan Markel and Prince Harry, Michael Huff (white, male) felt the need to inform Hayes that, "Meghan needs to stop whining about the UK and the Queen. She's African American and needs to learn how to ingratiate herself!"

g. Hayes shared that she was being made to feel like the uppity African American woman that didn't belong in the good ol' white bank.

141. Near the end of the meeting, Byrd told Hayes that she would document the January 10, 2020 conversation and send it to her; Hayes was not told there would be anything beyond a documented conversation.

142. Hayes did not receive the written documentation of the January 10, 2020 conversation for seventeen (17) days, and when she did, it was full of inaccuracies (see *infra* ¶144).

20

143.     Later in the morning on January 10, 2020, Hayes sent a follow-up email to Byrd and Almond confirming her understanding of what was discussed and what steps she was expected to take going forward.

144.     Hayes further asked a white colleague, Patricia Gallagher (white, female) if she had ever made a mistake on her mileage reports, to which the white colleague responded in the affirmative. Hayes asked what happened, and the white colleague said that "they just sent it back" to her for correction and HR has never came to meet with her about this.

145.     On January 15, 2002, in a Relationship Development Team meeting, Almond and Shearin announced a rollout of a new vision and shared the vision for branches. There was a new reporting spreadsheet shared, and a new expectation was to use the spreadsheet to keep track of customers.

146.     Hayes and other peers asked if there were goals for their team and Almond confirmed that there were no production goals for their team.

147.     On January 27, 2020, Hayes finally received the written documentation of the January 10, 2020 conversation from Almond, and when she did, it was full of inaccuracies.

**K. Hayes Receives Bogus Written Warning**

148.     On January 27, 2020, Hayes was visiting a branch manager, Brian Lane (white, male) at the Quinton location to coach him and partner with him to discuss market strategy.

149.     Almond knew of this scheduled visit and stopped by the Quinton branch to say hello. Unexpectedly, Almond asked Hayes to meet and invited her into an empty office directly beside the Quinton branch manager, Brian Lane (white, male), who could hear the entire conversation.

21

150.    Almond presented Hayes with a written corrective action to address her alleged performance failures and told her that he needed her to sign it.

151.    Hayes was shocked; she asked to read it before she signed, so Almond left the room for about five minutes.

152.     The written warning alleged that Hayes' performance was deficient in the following ways:

      a.  That Hayes was $10.00 off on a reimbursement report which she refused to take payment for;

      b.  That Hayes was seldom in the office and did not meet (nonexistent) production goals (Hayes' production was heavily impacted by the harassment she was receiving, and when she reported it to try and get help, she was brushed off);

      c.  That Hayes did not attend an event, Kasasa, (that was not a requirement for her to attend and was a branch manager and lower-level staff activity.) on November 20, 2019 (the day she was absent due to being in a car accident the day prior on her way to meet a customer);

      d.  That Hayes did not complete compliance courses on time (a common practice among her peers);

      e.  And that Hayes did not immediately report to her supervisor that she was unable to report to work following her November 19 car accident—yet Hayes notified her supervisor well within 24 hours.

153.    When Almond returned to the office Hayes became teary eyed and visibly upset; Hayes told Almond she suspected he was playing some kind of game and the information in the

corrective action was never discussed. Hayes accused Almond of fabricating events and flat out lying. Hayes told Almond it seemed like he was "working her out the door."

154.    Hayes reminded Almond that expectations around goals / sales production were never discussed and that he shouldn't hold her accountable for standards not implemented for others on her team (none of whom are African American). To this Almond replied: "I'm the EVP, and I can do what I want!"

155.    Hayes asked Almond if others on her team had been reprimanded for low production, and Almond told her condescendingly, "You don't worry about anyone else."

156.    Almond then threatened to assign Hayes a monthly goal—only Hayes, no other members of the team—which Hayes protested would be unfair.

157.    Hayes told Almond the majority of the information in the document had not actually been discussed with her on January 10, 2020, as was claimed in the document.[1]

158.    Hayes also questioned why she was being presented with a written corrective action three weeks after the meeting in which she was allegedly counseled. Almond had no response but told Hayes he needed her to sign.

159.    For fear of being fired on the spot, Hayes signed the inaccurate document.

160.    Hayes asked Almond how she could avoid being blindsided like this in the future around performance goals when there are no goals.

161.    Hayes requested to check in with him to get feedback on performance, to which Almond agreed.

---

[1] The written corrective action alleges that the contents within were discussed on January 9, the day PRIOR to any discussion with Hayes.

162.    Hayes was the only African American at the branch that day, and the building was small, and the offices were close together with thin walls; allowing all of the branch to hear everything. After Almond left, Lane, the Branch Manager with whom Hayes was supposed to meet that day, approached Hayes and said, "Wow…that didn't go good, huh?" Hayes left humiliated and embarrassed.

163.    For the next month Hayes copied Almond on emails and called him weekly to seek his input; he never told Hayes he was dissatisfied with her performance and on several occasions told her to "keep up the good work!"

164.    On January 28, 2020 Hayes reached out to HR Byrd with corrections to the written warning, including documentation to substantiate her corrections.

165.    Byrd directed Hayes to confront Almond by sending over a formal request to change her file.

166.    On January 30, 2020, Hayes followed Byrd's directive and sent a formal request to amend her file. Hayes drafted a memo pointing out each inaccuracy within the warning, and requested that the record be corrected:

> a.    The warning stated that Hayes was involved in a car accident on November 19, 2019 and that she did not notify her supervisor, Almond, and that he only found out about her absence from branch teammates. Hayes provided email documentation showing she notified Almond *prior to his arrival at the branch* – this after her 5:30 pm car accident, which was followed by her evening visit to the hospital, and she notified her supervisor at 9:41 am by email.

    b.   The warning claims that this infraction of non-notification re: her absence was discussed in the January 10, 2020 meeting; Hayes asserts that she was not made aware of this purported violation until the written warning.

    c.   Hayes points out that expectations were not set forth or communicated with her regarding the Kasasa event (a meeting for the various branch managers), and that she was unable to attend due to the car accident.

167.    On January 31, 2020, Byrd told Hayes that the written warning would remain as-is in her file, despite the blatant inaccuracies, and that her formal request to amend was denied; Byrd added that Hayes' inaccuracy memo would be added to her file.

**L.  Almond tells Hayes he is "Very Pleased" with her Work**

168.    On February 3, 2020, Almond cancelled a pre-planned face-to-face meeting, and instead they met over the phone.

169.    Hayes called Almond to check in and discuss her previous week's activities and performance. Almond told Hayes he was "very pleased" with her great work and told her to "keep the momentum going." Hayes also inquired about the upcoming performance reviews which were due by the end of the month. Almond assured Hayes that he was nearly done with them and she would have it by the end of the month.

170.    Hayes expressed concern that Almond had not been with the company during the majority of 2019 and offered to email him examples of her work from 2019 to fill in the gaps; Almond agreed.

171.    At no time during the February 3, 2020 phone call did Almond voice concerns regarding Hayes' performance, nor did he have anything negative to say.

172.    Almond did not mention the disputed claims regarding the written corrective action.

173.    From February 11 to 17, 2020 Almond was out of the office on a cruise vacation. Hayes and Almond did not communicate during his absence.

174.    On February 19, 2020, Hayes attended a corporate office event.

175.    Out of a total of 10-13 attendees, Hayes was the only African American person in attendance.

176.    Almond was present at the meeting but did not engage with Hayes; he did engage with Hayes' white colleagues.

177.    Almond walked right past Hayes without saying a word or glancing at her and greeted a (white male) branch manager, Jason Williams, by tugging on Williams' tie and whispering in his ear. Williams looked over at Hayes.

**M. Hayes terminated abruptly on March 4, 2020 under false pretenses**

178.    In her phone calls, meetings, and check-ins with Almond over the past month and half, Hayes had received nothing but positive feedback.

179.    During a March 4, 2020 meeting with Byrd and Almond, Plaintiff was abruptly terminated without warning.

180.    Almond and Byrd arrived at Hayes office and Almond informed Hayes he was disappointed with her sales production.

181.    Hayes inquired as to how she rated, for she knew her February numbers exceeded her prior months' referrals.

182.    Almond ignored Hayes and told her that the production wasn't sufficient.

183.    Almond also told Hayes that he'd heard from a Branch Manager, Jason Williams, that Hayes had received a customer complaint.

26

184.    Hayes requested to see the complaint and any supporting documentation for the sudden termination.

185.    Nothing was provided to Hayes, and Almond further told her that she asks "too many questions" and randomly inserted that Hayes should not have emailed Hill and Hastings the day prior asking for clarification on the date/time of an upcoming marketing event.

186.    Hayes pushed for answers and, yet again, iterated she was being treated unfairly and now being targeted because she asked questions while doing her job; Almond responded by laughing at Hayes and saying, "Don't try and pin this on me!"

187.    Hayes inquired as to why Almond was laughing at her. Almond did not answer.

188.    Byrd sat idly by as Almond taunted Hayes.

189.    In this March 4, 2020 meeting Hayes was not presented with any goals she did not meet, nor any prior communication regarding her performance.

190.    Hayes became deeply sad, felt humiliated, and upset.

191.    Hayes expressed to Almond and Byrd that she felt this was unethical and the allegations against her were untrue.

192.    Byrd finally said something in the meeting then, "Barry has decided to terminate you and if you do not stop with your tone, I am not going to offer you a severance."

193.    Hayes was horrified—her tone was agitated, but not unprofessional. She was merely trying to get answers regarding this abrupt employment decision.

194.    Hayes stopped speaking, took the severance package for review, and left the bank.

195.    Nothing was presented to Hayes in writing as to the reason for discharge, and no exit interview was offered.

27

## COUNT I
## RACE DISCRIMINATION, UNLAWFUL TERMINATION - § 1981

196.    Plaintiff alleges and incorporates all the above paragraphs.

197.    § 1981 prohibits discrimination on the basis of race.

198.    Plaintiff is a member of a protected class – African American; Plaintiff's performance met Defendant's reasonable expectations; Plaintiff suffered an adverse action (termination, written warning).

199.    Per the federal cited above, Plaintiff, was entitled to perform her duties without being subjected to discrimination based on her race.

200.    Defendant's actions and omissions constituted undue racially-based discrimination under applicable law, and caused significant harm, damages, and injury to Plaintiff, including but not limited to severe emotional pain and suffering and wrongful termination from her employment.

201.    As a result of the malice with which Defendant acted, Plaintiff is entitled to punitive damages.

202.    As a consequence of Defendant's action, it is additionally liable for compensatory damages, punitive damages, attorney's fees.

## COUNT II
## RETALIATION – § 1981

203.    Plaintiff alleges and incorporates all the above paragraphs.

204.    Plaintiff engaged in protected activity and opposition to unlawful practices while employed by the Defendant (see *supra* ¶¶ 23-30, 32-35, 57-59, 72, 81-85, 88-99, 114-116, 118-120, 137-140).

205.     As a result of her protected activity and opposition to unlawful practices, Plaintiff was subjected to adverse employment actions – a fabricated written disciplinary action and termination (see *supra* ¶¶ 39, 42-43, 55, 61-63, 70, 72, 148-167, 178-195).

206.     A causal connection exists between Plaintiff's protected activities and the adverse employment action taken by Defendant.

207.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits.

208.     The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignities arising from the discriminatory and retaliatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

209.     As a consequence of Defendant's action, it is additionally liable for compensatory and punitive damages, attorney's fees and other costs and interest in pursuit of this litigation.


**COUNT III**
**RACE DISCRIMINATION, UNLAWFUL TERMINATION – TITLE VII**

11.     Plaintiff alleges and incorporates all the above paragraphs.

12.     Title VII prohibits discrimination on the basis of race.

13.     Plaintiff is a member of a protected class – African American; Plaintiff's performance met Defendant's reasonable expectations; Plaintiff suffered an adverse action (termination, written warning).

14.     Per the federal cited above, Plaintiff, was entitled to perform her duties without being subjected to discrimination based on her race.

15.     Defendant's actions and omissions constituted undue racially based discrimination under applicable law, and caused significant harm, damages, and injury to Plaintiff, including but not limited to severe emotional pain and suffering and wrongful termination from her employment.

16.     As a result of the malice with which Defendant acted, Plaintiff is entitled to punitive damages.

17.     As a consequence of Defendant's action, it is additionally liable for compensatory damages, punitive damages, attorney's fees.

## COUNT IV
## RETALIATION – TITLE VII

18.     Plaintiff alleges and incorporates all the above paragraphs.

19.     Plaintiff engaged in protected activity and opposition to unlawful practices while employed by the Defendant (see *supra* ¶¶ 23-30, 32-35, 57-59, 72, 81-85, 88-99, 114-116, 118-120, 137-140).

20.     As a result of her protected activity and opposition to unlawful practices, Plaintiff was subjected to adverse employment actions – a fabricated written disciplinary action and termination (see *supra* ¶¶ 39, 42-43, 55, 61-63, 70, 72, 148-167, 178-195).

21.     A causal connection exists between Plaintiff's protected activities and the adverse employment action taken by Defendant.

22.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits.

23.     The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignities arising from the discriminatory and retaliatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

24.     As a consequence of Defendant's action, it is additionally liable for compensatory and punitive damages, attorney's fees and other costs and interest in pursuit of this litigation.

### COUNT V
### UNEQUAL PAY FOR EQUAL WORK – EQUAL PAY ACT

25.     Plaintiff alleges and incorporates all the above paragraphs.

26.     Defendant has employed Plaintiff Hayes and a male employee in jobs requiring substantially equal skill, effort and responsibility (see *supra* ¶¶ 19-22);

27.     The two jobs were performed under similar working conditions (see *supra* ¶¶ 18-22);

28.     Plaintiff Hayes was paid a lower wage than the male employee doing substantially equal work (see *supra* ¶ 19).

29.     Under the Equal Pay Act, Plaintiff Hayes was entitled to the pay that she should have received for equal work, with that figure doubled as liquidated damages.

30.     When considering and as a consequence of Defendant's acts and omissions, Defendant is additionally liable for all attorney's fees and other costs and interest tied to this litigation.

## COUNT VI
## RETALIATION – EQUAL PAY ACT

31.     Plaintiff engaged in protected activity and opposition to practices made unlawful by the Equal Pay Act while employed by the Defendant (see *supra* ¶¶ 23-28).

32.     As a result of her protected activity and opposition to unlawful practices, Plaintiff was subjected to an adverse employment action – termination (see *supra* ¶¶ 176-193).

33.     A causal connection exists between Plaintiff's protected activities and the adverse employment action taken by Defendant.

34.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injuries, including but not limited to loss of substantial past salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities, and loss of retirement savings and benefits. Plaintiff has also suffered from severe emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignities arising from the discriminatory acts and omissions of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resulting financial hardship.

35.     As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest tied to this litigation.

## COUNT VII
## UNEQUAL PAY FOR EQUAL WORK– Code of VA § 40.1-28.6.

36.     Plaintiff alleges and incorporates all the above paragraphs.

37.     Defendant has employed Plaintiff Hayes and a male employee in jobs requiring substantially equal skill, effort and responsibility (see *supra* ¶¶ 19-22);

38.     The two jobs were performed under similar working conditions (see *supra* ¶¶ 18-22);

39.     Plaintiff Hayes was paid a lower wage than the male employee doing substantially equal work (see *supra* ¶ 19).

40.     Under the Equal Pay Act, Plaintiff Hayes is entitled to the pay that she should have received for equal work, with that figure doubled as liquidated damages.

41.     As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest tied to this litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff Sherita Hayes respectfully requests the following:

A.  Enter judgment for the Plaintiff against the Defendant on all counts;

B.  Award the Plaintiff punitive damages in the maximum amount allowed by law and that would be sufficient to ensure the Defendant takes complying with the law seriously and deter others from engaging in similar behavior;

C.  Award the Plaintiff full back pay (double damages where appropriate for the Equal Pay Act claims) and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses, cash awards, loss of retirement savings and benefits, and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case;

D.  Award Plaintiff pecuniary and out of pocket expenses tied to this litigation;

E.  Order Defendant to pay all reasonable attorney's fees, court costs, expert fees, and expenses, incurred by Plaintiff as a result of Defendant's acts and omissions, as well as pre-judgment and post-judgment interest;

F.  Appropriate declaratory relief, finding that The Bank violated anti-discrimination laws and to ensure it complies therewith in the future;

G.  Order any and all other such other equitable and legal relief as the Court deems just and appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial for this action on all counts and claims so triable.

Respectfully submitted.

**SHERITA HAYES**

By Counsel,

**THE BROWN FIRM PLLC**

By: ___/s/_____
        Christopher E. Brown, Esq.
        VSB#39852
        526 King St. Suite 213
        Alexandria, VA 22314
        Tel: 703-924-0223
        Fax: 703-997-2362
        cbrown@brownfirmpllc.com
        *Counsel for Plaintiff Sherita Hayes*

34