IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SHERITA HAYES,

        Plaintiff,

v.                                                         Civil Action No. 3:21cv230

SONABANK, now known as
PRIMIS BANK,

        Defendant.

## OPINION

Shortly after Sherita Hayes started working at Sonabank, now known as Primis Bank ("Sonabank" or "the bank"), in 2018, Sonabank offered her a "Relationship Manager" position on its newly formed sales team. In that position, Hayes—an African American woman—worked to retain and attract clients for the bank. Despite the fact that Hayes's supervisor did not set production goals for the team, Sonabank ultimately fired her for her "job performance" and "lack of production" in March 2020. Hayes now sues Sonabank for unlawful termination and retaliation based on race.[1]

Because Hayes did not meet Sonabank's legitimate performance expectations, and because Sonabank replaced Hayes with another African American woman two months after it fired her, Hayes cannot prove a prima facie case of wrongful termination. The Court will grant Sonabank's

---

[1] On Sonabank's motion, the Court dismissed Hayes's claim for unequal pay for equal work under the Virginia Equal Pay Act ("VEPA"), (Count VII), because the Fair Labor Standards Act, not VEPA, applies to Sonabank. (ECF Nos. 14, 15.) On the parties' joint motion, the Court also acknowledged the parties' voluntary dismissal of Hayes's claims for unequal pay for equal work and retaliation under the Equal Pay Act, (Counts V and VI). (ECF No. 32.)

Following these dismissals, four claims remain: race discrimination and unlawful termination under 42 U.S.C. § 1981, (Count I); retaliation under 42 U.S.C. § 1981, (Count II); race discrimination and unlawful termination under Title VII of the Civil Rights Act of 1964 ("Title VII"), (Count III); and retaliation under Title VII, (Count IV).

motion for summary judgment on Counts I (unlawful termination under § 1981) and III (unlawful termination under Title VII).

Though Hayes makes a prima facie case of retaliation under § 1981 and Title VII, Sonabank offers legitimate, nondiscriminatory reasons for firing her and Hayes does not satisfy her burden of showing that those reasons constituted mere pretext. The Court will, therefore, also grant Sonabank's motion for summary judgment on Counts II (retaliation under § 1981) and IV (retaliation under Title VII).

## I. **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a claim, defense, or part of a claim or defense. The rule directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because the standard asks whether any genuine disputes of material fact exist, the mere presence of some factual disputes does not defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The party seeking summary judgment may succeed by establishing the absence of a genuine issue of material fact or showing that the other party cannot produce admissible evidence to support their claim: "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding a summary judgment motion, the Court must draw all reasonable inferences in favor of the non-moving party. *Id.* at 255. *But see Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). It must also "disregard evidence favorable to the moving

2

party that the jury is not required to believe" and "give credence to . . . 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (quoting Wright & A. Miller, Federal Practice and Procedure § 2529, at 300 (2d ed. 1995)).[2]

## II. FACTS[3]

Hayes worked for Sonabank from 2018 to 2020. (ECF No. 34, at 2 ¶ 1.) She started as a Branch Manager and Assistant Vice President at the bank's Hull Street Branch, but became a Relationship Manager ("RM") at the bank's Broad Street Branch in October 2018. (*Id.* at 4 ¶¶ 7, 9.) Sonabank had created the RM position after Sonabank merged with another bank and "then-CEO Joe Shearin directed then-President Jeffrey Culver to launch a sales team." (*Id.* at 3 ¶ 1.) Culver met with and picked eight existing bank employees to serve as RMs on the new "Relationship Management team," whose job duties included "retaining, expanding and attracting high profile

---

[2] *See also id.* (quoting *Anderson*, 477 U.S. at 250–51) ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'").

[3] "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Loc. Civ. R. 56(B); *see also Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018) (the nonmoving party "must produce evidence that goes beyond '[c]onclusory or speculative allegations'" and rely on more than "a mere scintilla of evidence" to withstand summary judgment). This section thus includes facts set forth by Sonabank that Hayes does not dispute or for which Hayes failed to produce "more than 'a mere scintilla of evidence.'" *Hodgin*, 885 F.3d at 252.

This section also includes disputed, immaterial facts that the Court views in the light most favorable to Hayes. *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) ("A fact is material if it might affect the outcome of the suit under the governing law." (quoting *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013))).

clients across all business lines."[4]  (ECF No. 34, at 3 ¶¶ 2–4; ECF No. 36-4, at 4 (draft position description); ECF No. 34-7, at 4 (email from then-Human Resources Director Shanita Byrd to Hayes with job description); ECF No. 36–45 (final position description).)[5]  After Sonabank established the team, for some period of time no specific individual production goals existed.  (ECF No. 34, at 8 ¶ 27.)

When Hayes began her new position as an RM, she reported to Culver.  (*Id.* at 4 ¶ 9.) Culver periodically scheduled RM team meetings to "discuss the goals of the program." (*Id.* at 6 ¶ 18.)  In October 2018, Culver held a meeting at the Sonabank "corporate office with three RMs"—including Hayes—"to discuss the program." (*Id.* at 5 ¶ 14; ECF No. 36-1, at 1 ¶ 3.)  The same day, Culver, Byrd, and Hayes stood near a cubicle and "discussed pay." (ECF No. 34, at 5 ¶ 14; ECF No. 34-6, at 107:15–16.)  After Culver left, Byrd told Hayes "they treat us differently here" and "rubbed the back of her [own] hand." (ECF No. 34, at 6 ¶ 15.)  With this gesture, Byrd "show[ed Hayes] the color of [her] skin"—alluding to the fact that "both [women] are African American." (*Id.*)  Hayes did not respond and did not report the comment to anybody, despite her

---

[4] When Culver met with Sonabank employee Jeffrey Bracewell to discuss the RM position after the merger, "the expectation was production, production, production." (ECF No. 34-4, at 24:3–4.) Hayes argues that the Court may not consider this statement because it constitutes hearsay. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[S]everal circuits, including the Fourth Circuit, have stated that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Only "statement[s]" that "a party offers in evidence to prove the truth of the matter asserted in the statement" constitute hearsay. Fed. R. Evid. 801(c)(2). Because Bracewell's statement reflects his perception of the position based on his conversation with Culver, it is not a statement offered to prove the truth of the matter asserted.

[5] Hayes says that "[t]he final job description was never communicated to the RM team or posted on Primis' intranet." (ECF No. 36, at 9–10 ¶ 3.) The draft job description Culver sent to Hayes on September 16, the job description Byrd sent to Hayes on September 18, and the official job description that Hayes says she never received all describe the position as quoted here.

"strong and positive relationship" with Culver. (*Id.* ¶ 16.)[6]

After Culver left the bank in the summer of 2019, Shearin supervised the RM team until September 2019. (*Id.* at 8 ¶ 26.) At that time, former Sonabank executive Barry Almond "returned to [the bank] as Regional Sales manager" and started supervising the team. (*Id.*) On October 9, 2019, Almond and Shearin held a meeting that several bank employees attended. During the meeting, a white bank employee made a comment about a noose. (*Id.* at 9 ¶ 32.) Everyone except Hayes laughed in response. (*Id.*) Hayes complained to Almond about the comment on November 27, 2019, and "expressed how offensive it was to [her]." (ECF No. 36-1, at 4 ¶ 19.)[7]

Sonabank "has a Compliance Team responsible for overseeing [Community Reinvestment Act ("CRA") activities[8]] activities to ensure compliance with the regulation." (ECF No. 34, at 8 ¶ 25.) The Federal Reserve regularly evaluates Sonabank's compliance with the CRA by assigning the bank a rating of "Outstanding," "Satisfactory," "Needs to Improve," or "Substantial Noncompliance." (*Id.*) In April 2019, the bank received a "Satisfactory" rating. (*Id.*)

In 2019, Hayes also began to focus on CRA activities. (*Id.* at 7 ¶¶ 22–23.) She also invested time in diversity and inclusion efforts. (*Id.* at 7 ¶ 22.) Hayes also worked closely with Julie

---

[6] Byrd says that this incident did not happen. (*Id.* ¶ 17.) The Court nevertheless considers Hayes's recollection of events in ruling on Sonabank's motion for summary judgment. *See supra* note 3.

[7] Sonabank disputes both whether the incident occurred and whether Hayes complained about it. Other employees present at the meeting say that they did not hear the comment, and Sonabank says Hayes did not report it. The Court nevertheless considers Hayes's recollection of events in ruling on Sonabank's motion for summary judgment. *See supra* note 3.

[8] The CRA "requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income (LMI) neighborhoods." Board of Governors of the Federal Reserve, *Community Reinvestment Act (CRA)*, https://www.federalreserve.gov/consumerscommunities/cra_about.htm (last visited July 12, 2022).

Hill,[9] Director of Sonabank's Potential of Women Entrepreneurs Realized marketing program, and Michelle Simon, Head of Marketing. (ECF No. 34, at 7 ¶ 20.)[10] In June 2019, however, Byrd told Hayes that "diversity and inclusion training is not one of [Sonabank's] strategic focuses at this time." (ECF No. 34-12, at 2.) And at some point, Hayes received feedback about "staying in [her] lane" with regard to the CRA. (ECF No. 36-68, at 4.)

With regard to her sales duties, in 2019 Hayes achieved a $3.8 million checking account acquisition; "$200K rollover from a 30 yr. employee and 10 Kasasa accounts"; a small business relationship "totaling [$]1.2 million"; the referral of five non-profits; "a 401(k) rollover in 2nd quarter that resulted in a big win of $550k"; and "35 consumer deposit new checking accounts for 2019 that were referred to Hull and Broad." (ECF Nos. 36-12, 36-13, 36-33, 36-35, 36-38, 36-39.) She also advocated for a higher rate for a customer on at least one occasion. (ECF No. 36-40.)

Despite these successes, Hayes also received negative feedback from management. This included feedback that she had submitted an expense report incorrectly and that she was delinquent in completing mandatory online training regarding compliance with laws and regulations, known as "BVS training."[11] (*Id.* ¶¶ 33–35, 37; ECF No. 36-1, at 5 ¶ 21.) On January 10, 2020, Almond and Byrd met with Hayes to discuss her performance. (ECF No. 34, at 12 ¶ 43.) After the meeting, Almond issued a Notice of Correction (the "written warning")—which Hayes signed—that

---

[9] On June 24, 2022, Sonabank filed a notice of objection to certain statements Hill made during her deposition. (ECF No. 38.) During the July 11 hearing, Sonabank referred to this notice as a motion. The Court need not address the notice, nor treat it as a motion, because the Court does not rely on the challenged statements in ruling on Sonabank's motion for summary judgment.

[10] Neither Hill nor Simon had authority to terminate Hayes. (ECF No. 34, at 7 ¶ 21; ECF No. 36, at 13 ¶ 21.)

[11] If employees do not complete the training on time, it "could cause an adverse result in a bank audit." (ECF No. 34, at 10 ¶ 34.)

detailed the issues with her expense report, her lack of production, the need to work with her branch manager, her failure to complete training courses on time, and her failure to complete production reports on time.[12]   (ECF No. 34-36.)  Hayes appealed the warning, and Byrd denied the appeal. (ECF No. 34, at 14 ¶ 48; ECF No. 34-38; ECF No. 34-39.)

On March 3, 2020, Sonabank's marketing department complained that a marketing event Hayes co-planned "was very poorly planned and executed." (ECF No. 34, at 15 ¶ 54.) Sonabank fired Hayes the next day. (*Id.* ¶ 55.)

Sonabank then advertised the RM position at the Broad Street Branch, but changed the RM job "description," "focus," "responsibilities," and "production goals." (ECF No. 36, at 32.) Specifically, the job posting identified a set number of hours per week, required that the RM be present in the branch, and emphasized that the RM must bring in bank deposits as part of the job. (ECF No. 36-1, at 7 ¶ 31.) Two months after Sonabank fired Hayes, it hired Markeia Johnson, another African American woman, for the RM position at the Broad Street Branch. (ECF No. 34-43 (Johnson offer letter).)

---

[12] Hayes says that the contents of the written warning conflict with Almond's and Byrd's notes from the meeting regarding the warning. (ECF No. 36, at 31.) Specifically, Hayes claims that Almond did not bring any notes to the meeting and that she did not see him write anything down. (*Id.* at 19 ¶ 43.) She then says that Byrd wrote about the expense report concern, performance issues ("[W]hen we met in Nov that was the first time anyone has had a conversation [with] me about expectations."), and Hayes's concern that she had been "blackballed," but not the other issues in the written warning. (ECF No. 36-24.)

Even if Almond did not take notes during the meeting, or if Byrd's notes do not fully capture the activities identified in the written warning, the written warning outlines Hayes's deficient job performance and memorializes such performance in a document that Hayes signed. Hayes further identified several of the addressed issues in a follow-up email she sent to Almond and Byrd. (ECF No. 34-35.)

### III. DISCUSSION

A plaintiff can bear her initial burden of proving a prima facie case of discrimination "either through direct evidence of discriminatory intent, or by using the four-part *McDonnell Douglas* scheme which provides an inference of discriminatory intent." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227–28 (4th Cir. 1998). Direct evidence constitutes "'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013); *see also Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) ("Thus, to prove discriminatory animus, the derogatory remark cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'" (alteration in original) (quoting *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991))), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003).

Here, Culver held a meeting at the Sonabank "corporate office with three RMs"—including Hayes—in October 2018 "to discuss the program." (ECF No. 34, at 5 ¶ 14; ECF No. 36-1, at 1 ¶ 3.) The same day, Culver, Byrd, and Hayes stood near a cubicle and "discussed pay." (ECF No. 34, at 5 ¶ 14; ECF No. 34-6, at 107:15–16.) After Culver left, Byrd told Hayes "they treat us differently here" and "rubbed the back of her [own] hand." (ECF No. 34, at 6 ¶ 15.) With this gesture, Byrd "show[ed] Hayes] the color of [her] skin"—alluding to the fact that "both [women] are African American." (*Id.*) Hayes did not respond and did not report the comment to anybody, despite her "strong and positive relationship" with Culver. (*Id.* ¶ 16.)

In addition, Almond and Shearin held a meeting on October 9, 2019, that several bank employees attended. During the meeting, a white bank employee made a comment about a noose.

8

(*Id.* at 9 ¶ 32.) Everyone except Hayes laughed in response. (*Id.*) Hayes complained to Almond about the comment on November 27, 2019, and "expressed how offensive it was to [her]." (ECF No. 36-1, at 4 ¶ 19.)

Despite the troubling nature of these comments, Hayes does not draw any causal connection between these isolated instances of Sonabank employees' discriminatory statements and attitudes and the decision to terminate her employment. In addition, evidence that Sonabank received a "Satisfactory" rating or needed improvement in some areas in its CRA evaluation, or that the bank did not have an interest in furthering diversity and inclusion training, does not constitute direct evidence of discrimination in Sonabank's decision to fire her.

Because Hayes does not provide direct evidence of discriminatory conduct, she must proceed under the *McDonnell Douglas* burden-shifting framework. *Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 991 (E.D. Va. 2017) (applying this test to claims brought under Title VII); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (finding that the *McDonnell Douglas* framework also applies in discrimination cases under § 1981 and in retaliation cases under both Title VII and § 1981).

Under *McDonnell Douglas*, Hayes must first establish a prima facie case of discrimination or retaliation. *Guessous*, 828 F.3d at 216. If she meets her burden, Sonabank must then "articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Id.* Finally, if Sonabank meets its burden of production, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.*

**A. *Wrongful termination under 42 U.S.C. § 1981 (Count I) and Title VII (Count III)***

To establish a prima facie case of wrongful termination under Title VII, Hayes must show that: (1) she "is a member of a protected class"; (2) she "suffered an adverse employment action;" (3) "at the time the employer took the adverse employment action [she] was performing at a level that met her employer's legitimate expectations;" and (4) "the position remained open or was filled by a similarly qualified applicant outside the protected class."[13] *Scott v. Health Net Fed. Servs., LLC*, 807 F. Supp. 2d 527, 533–34 (E.D. Va. 2011). Hayes satisfies the first two elements of a prima facie case; she is African American and suffered an adverse employment action when Sonabank fired her. The parties dispute whether she met Sonabank's legitimate expectations and whether her position remained open after Sonabank fired her. Because Hayes does not establish either of these elements for her wrongful termination claims, the Court need not determine whether Sonabank has met its burden of production under the *McDonnell Douglas* burden-shifting framework.

*1. Job Performance*

To show that she met Sonabank's legitimate expectations, Hayes presents "several performance reviews," "evidence of her production," Sonabank's "refusal to produce evidence that would show her actual production," "evidence that her efforts to seek sponsorships were being

---

[13] The elements of a wrongful termination claim brought under § 1981 nearly mirror those of a wrongful termination claim brought under Title VII. To establish a prima facie of wrongful termination in violation of § 1981, the plaintiff "must show that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] job and [her] job performance was satisfactory; (3) [s]he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." *Honor v. Booz-Allen & Hamilton*, 383 F.3d 180, 188 (4th Cir. 2004).

repeatedly denied,"[14] and Sonabank's "refusal to produce evidence that would support that . . . show[] Hayes was meeting her employer's expectations."[15]   (ECF No. 36, at 31.)

Of the ten examples Hayes points to for her "[p]ositive [p]roduction," (ECF No. 36, at 7 ¶ L), five appear to refer to the same $3.8 million checking account acquisition from January 2019. (ECF Nos. 36-12, 36-13, 36-33, 36-38, 36-39.)  Another shows emails between Almond and Byrd discussing Hayes's evaluation and issuance of a "written vs. final warning."  (ECF No. 36-34.) Two others—the 2019 First Quarter and April 2019 sales team updates—show Hayes performing in the bottom half of the six listed RMs for the number of clients and the amount of new deposits. (ECF Nos. 36-14 (April 2019 Update), 36-36 (First Quarter Update), 36-37 (April 2019 Update).)

The only other evidence Hayes cites to support her performance includes (1) an email chain between Hayes and a personal banker at the Hull Street Branch, and (2) her self-evaluation for 2019.  In the email chain between Hayes and the banker, Hayes says she asked Almond to support a higher rate for a customer, but that Almond refused because the bank "[was] really looking to acquire 'transactors[,]' those clients with transaction[s] in a checking account."  (ECF No. 36-40.)

---

[14] Hayes often asked Sonabank to sponsor minority businesses or "colored or underserved community events and groups."  (ECF No. 36-1, at 3–4 ¶¶ 9, 16.)  Sonabank denied several of Hayes's sponsorship requests, but also granted some.  (ECF No. 34-10, at 4 ¶ 12.)  Sonabank states that whether Sonabank granted Hayes's sponsorship requests "is . . . immaterial to her success as a[n RM]" because "[t]here is no evidence in the record that the award of sponsorships materially enhanced any [RM's] success."  (ECF No. 37, at 3.)

[15] (ECF No. 36, at 3–4 ¶ G) (Hayes's claims that Sonabank cannot find monthly production and sponsorship reports.)  Hayes says that "the jury will be free to conclude" that Sonabank did not produce the reports "because [the] reports would support Hayes['s] claims."  (*Id.* at 4 ¶ G.) Sonabank responds that it produced the reports that existed.  (ECF No. 37, at 9.)  Hayes has not yet asked the Court to, and the Court has not determined whether it should, give the jury an adverse inference instruction.  *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (finding that the district court properly allowed "the jury to draw an adverse inference if [the jury] found that [the defendant] *caused* destruction or loss of relevant evidence" (emphasis added)).

This conversation shows that Hayes attempted to obtain a deal on behalf of a client, but otherwise does little to support Hayes's claims that her performance met Sonabank's expectations.

In her self-evaluation, Hayes reports that she achieved "$200K rollover from a 30 yr. employee and 10 Kasasa accounts"; a small business relationship "totaling [$]1.2 million"; the referral of five non-profits; "a 401(k) rollover in 2nd quarter that resulted in a big win of $550k"; and "35 consumer deposit new checking accounts for 2019 that were referred to Hull and Broad." (ECF No. 36-35.) She also says that she "stepped up" in the second quarter when "the bank presented a need to improve CRA engagement." (*Id.*) She describes the third quarter as "a bit bump[y] with internal partnership challenges," but says she gained the "tools and support from management . . . needed to bring about positive change." (*Id.*)

In addition to this information about her own performance, Hayes points out that another Sonabank employee—Patricia Gallagher—remains employed with Sonabank despite being "the lowest performer" in 2019 and consistently receiving performance critiques from 2006 through 2020. (ECF No. 36, at 21 (citing eight of Gallagher's performance appraisals).)

Notwithstanding the fact that Gallagher served as an RM during only one of the eight review periods Hayes cites,[16] proof of Gallagher's performance "is *not* proof that [Hayes's] performance met [Sonabank's] legitimate job performance expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (emphasis in original). Rather, in determining whether Hayes met Sonabank's expectations, the Court looks to "the opinion of [her] supervisors, with whom she worked on a regular basis." *Bart-Williams v. Exxon Mobil Corp.*, No. 1:16cv1338, 2017 WL 4401463, at *10 (E.D. Va. Sept. 28, 2017); *see also Evans v. Techs. Applications & Serv. Co.*, 80

---

[16] Before 2018, Gallagher held various marketing positions. (ECF Nos. 36-25 to -29.) She then worked as an RM in 2018, a community relations officer in 2019, and an RM/community relations officer in 2020. (ECF Nos. 36-30 to -32.)

F.3d 954, 960–61 (4th Cir. 1996) ("'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980))).

In this case, Hayes worked as an RM with responsibility for retaining, expanding, and attracting high profile clients, and Sonabank expected that she would also comply with the bank's administrative and training requirements. Hayes did not do so. She not only "fail[ed] to drive sales," but she "consistently fail[ed] to timely complete mandatory BVS trainings,"[17] "repeatedly submitt[ed] erroneous expense reimbursement reports," "fail[ed] to proactively work with Branch Managers and other partners," and "fail[ed] to turn in production reports on time."[18] (ECF No. 34, at 21.) The January 2020 written warning—which Hayes signed—detailed the issues with her expense report, her lack of production, the need to work with her branch manager, her failure to complete training courses on time, and her failure to complete production reports on time. (ECF

---

[17] Hayes acknowledges receiving a written warning for her tardiness in completing the trainings in 2020, (ECF No. 36-1, at 5), but argues that she "was not chronically late" and emphasizes that many bank employees failed to timely complete their training courses, (ECF No. 36, at 17). Hayes's tardiness—not her coworkers' tardiness—matters for the Court's analysis here. *See Rumsfeld*, 328 F.3d at 149.

[18] Hayes argues that Sonabank cannot justify her termination with other evidence of these failures because Sonabank "paper[ed] the record" to cover up its discriminatory animus. (ECF No. 36, at 31 (citing *Linton v. Carter*, No. 1:14cv1520, 2015 WL 4937447, at *21 (E.D. Va. Aug. 18, 2015)).) But the evidence Hayes presents in support of her performance actually shows that her production numbers remained lower than several of her colleagues', and other evidence in the record shows that Hayes did not finish her BVS training courses on time, (ECF Nos. 34-27, 36-21), inaccurately completed her expense report, (ECF Nos. 34-26, 36-58), received feedback about "staying in [her] lane" with regard to CRA activities, (ECF No. 36-68, at 4), did not contact a client as instructed, (ECF No. 34-40), did not meet with her branch manager as instructed, (ECF No. 34-36), and did not produce referrals for the Broad Street branch between October and late February, (ECF No. 34-40).

No. 34-36.)  After Hayes's performance did not improve, Sonabank terminated Hayes's employment on March 4, 2020.  (ECF No. 34, at 15 ¶ 55.)

Even if Sonabank did not establish clear metrics for measuring performance during Hayes's tenure,[19] when Hayes became an RM she joined a sales team.  In 2019, her then-supervisor Culver told her to step back from CRA activities (that is, to "stay in her lane"),[20] and Almond affirmed that Hayes should focus on production, along with other feedback, in the January 2020 written warning.  Hayes self-reported gaining certain deposits and referrals in 2019,[21] but the evidence presented shows that Hayes was not a top performer on the RM team.  Perhaps Sonabank should have given Hayes more time to implement the January 2020 feedback, but the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination."  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d

---

[19] (ECF No. 34-46 (October 18, 2019 email from Almond explaining that he would "provide more clarity [for the RM role] in the weeks to come"); ECF No. 36-16, at 51:12–23 (Gallagher explaining that for some period of time Sonabank did not set specific numeric goals for the RMs); ECF No. 36-19, at 35:1–19 (Bracewell explaining that, even though Sonabank did not establish specific quotas, he expected Sonabank to judge his performance "on deposits and new customers").)

[20] (*See also* ECF No. 36-68, at 2 (email from Ann-Cabell Williams, Sonabank's head of retail operations, to Hayes about her involvement in CRA activities in which Williams stated, "I agree[] that your main responsibility is as an RM and to retain and grow deposits/relationships").)

[21] The Court "may properly rely on the nonmoving party's own deposition testimony, affidavits, or declarations to reject summary judgment." *Lyons v. City of Alexandria*, 35 F.4th 285, 288 (4th Cir. 2022).  *But see Bart-Williams*, 2017 WL 4401463, at *10 ("Plaintiff's self-serving testimony regarding her own job performance 'cannot [demonstrate] a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations.'" (alterations in original) (quoting *Rumsfeld*, 328 F.3d at 149)).

406, 410 (7th Cir. 1997)).  Upon consideration of these facts, the Court finds that Hayes did not meet Sonabank's legitimate performance expectations.

## 2. *Filling the Position*[22]

A Title VII plaintiff ordinarily must show that her position "remained open or was filled by similarly qualified applicants outside [of her] protected class." *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004)).  A plaintiff need not satisfy this prong, though, "where there has been a significant lapse of time between the plaintiff's application and its eventual decision to hire another individual within the same protected class," *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998), or different decisionmakers fire the plaintiff and hire her replacement, *Miles*, 429 F.3d at 489.  In addition, "there may be circumstances in which the differences between [the plaintiff's and the new] written job descriptions are so stark such that it cannot be said that 'the [plaintiff's] position remained open to similarly qualified applicants.'" *Burgess v. Bowen*, 466 F. App'x 272, 279 (4th Cir. 2012) (quoting *Burgess v. Bowen*, No. 1:09cv763, 2010 WL 3064307, at *8 (E.D. Va. Aug. 2, 2010), *vacated and remanded on other grounds*, 466 F. App'x 272).

In this case, Sonabank hired Markeia Johnson, another African American woman, for the RM position at the Broad Street Branch two months after it fired Hayes.  (ECF No. 34-43 (Johnson offer letter).)  Despite Johnson's identical job title, Hayes argues that Sonabank changed the RM job "description," "focus," "responsibilities," and "production goals."  (ECF No. 36, at 32.)

---

[22] For a § 1981 claim, Hayes would need to show that "other employees who are not members of the protected class were retained under apparently similar circumstances." *Honor*, 383 F.3d at 188.  Hayes does not address this distinct element under § 1981, nor does she specifically identify any employees who would satisfy it.  To the extent Hayes intends to argue that Sonabank retained Gallagher—a "white female," (ECF No. 36, at 21 ¶ 45)—under apparently similar circumstances, she also fails to satisfy this element for the reasons outlined in Part III.A.1 (explaining that for many years Hayes and Gallagher held different roles).

Specifically, Hayes recalls that the job posting identified a set number of hours per week, required that the RM be present in the branch, and emphasized that the RM must bring in bank deposits as part of the job. (ECF No. 36-1, at 7 ¶ 31.)

Even if Sonabank modified the RM job description to clarify the job responsibilities, emphasize the working hours, and include production expectations, the position remained the "functional equivalent" of what Sonabank expected of Hayes when she worked as an RM. *Burgess*, 466 F. App'x at 278. In addition, Hayes cannot invoke a significant time lapse exception where Sonabank hired Johnson only two months after firing Hayes. *Cf. Brown*, 159 F.3d at 905 (citing *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir. 1984) (finding that an eleven-month hiring delay "significantly diminish[ed] the reliability of subsequent hiring as an indicator of [the employer's] intent")). Hayes thus fails to satisfy this element of her Title VII claim.

### B. Retaliation under § 1981 (Count II) and Title VII (Count IV)

#### 1. Prima Facie Case

"A plaintiff can prove illegal retaliation under Title VII or § 1981 if [s]he shows that '(1) [s]he engaged in protected activity, (2) [s]he suffered an adverse employment action at the hands of [her employer]; and (3) [the employer] took the adverse action because of the protected activity.'" *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001)).[23] Neither party disputes that Hayes satisfies the second element—suffering an adverse employment action.

---

[23] *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) ("A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements" as a Title VII retaliation claim.).

### a. Protected Activity

Hayes points to three protected activities: first, when she referred a diversity trainer to Byrd in March 2019, but Byrd said Sonabank does not have an "appetite" for that sort of training; second, when Hayes complained about a "noose" comment a coworker made; and third, when Hayes told Almond and Byrd that she was being "blackballed." (ECF No. 36, at 33.)

"Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Id.* Oppositional conduct "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Laughlin*, 149 F.3d at 259). Title VII protects an employee who opposes both actions that are "actually unlawful under Title VII" and those she "reasonably believes to be unlawful." *Boyer-Liberto*, 786 F.3d at 282 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)). "To determine whether an employee has engaged in legitimate opposition activity," the Court "balance[s] the purpose of [Title VII] to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Laughlin*, 149 F.3d at 259 (quoting *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981)). Because none of the activities Hayes describes occurred during an ongoing investigation or proceeding, the Court evaluates whether these activities constitute oppositional conduct.

Hayes's first alleged protected activity does not constitute oppositional conduct.  In her email to Byrd, Hayes reiterates her understanding that Sonabank is not interested in diversity training and asks Byrd for assistance communicating that to a potential partner.  (ECF No. 36-10.) Nothing in the email resembles a complaint or even implies that Hayes has an opinion on the matter.  As such, the email does not constitute protected activity.

For the second alleged protected activity, Hayes claims that a fellow bank employee made a comment about a noose during a meeting and that everyone in the room laughed in response. (ECF No. 34, at 9 ¶ 32.)  Hayes says that she complained to Almond about the comment on November 27, 2019, and "expressed how offensive it was to [her]."  (ECF No. 36-1, at 4 ¶ 19.) Sonabank disputes both whether the incident occurred and whether Hayes complained about it. Because Hayes could have reasonably believed that she was complaining about an unlawful activity under Title VII, whether this incident and her complaint occurred constitute disputed material facts.

For the final alleged protected activity, Hayes told Almond and Byrd in a January 10, 2020 meeting that she thought she "was being blackballed and treated unfairly."  (ECF No. 36-1, at 6 ¶ 28; *see* ECF No. 36-24.)  Hayes's complaints do not specifically mention Title VII, any particular claims of discrimination, or any treatment based on race.  Construed expansively and in the light most favorable to Hayes, however, Hayes complained to these decisionmakers about her treatment at work and could have reasonably believed that a Title VII violation had occurred.

The Court finds that Hayes's complaint about the "noose" comment—if a jury were to conclude that it occurred and that she complained about it—and her complaint about being "blackballed" constitute protected activity.

### b. Causal Link

A plaintiff may establish a causal connection in two ways: (1) by offering "facts that 'suggest[] that the adverse action occurred because of the protected activity,'" *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 123 (4th Cir. 2021) (alteration in original) (quoting *Johnson v. United Parcel Serv.*, 839 F. App'x 781, 784 (4th Cir. 2021)), or (2) by "establish[ing] that 'the adverse act bears sufficient temporal proximity to the protected activity,'" *id.* (quoting *Johnson*, 839 F. App'x at 784). In addition, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Id.* at 124. Because Hayes made both complaints to decisionmakers, the Court finds that the decisionmakers knew of the complaints at the time the bank fired Hayes. Fulfilling the knowledge requirement, though, does not fully satisfy the requirements for causation. Hayes does not offer any link between the protected activities and her termination, so her claim survives only if temporal proximity exists.

Hayes says she complained to Almond about the "noose" comment on November 27, 2019. Sonabank did not fire her, though, until March 4, 2020. Even if a jury found that the comment happened and that Hayes complained about it, the three-month temporal gap between her complaint and her termination is too long to prove causation by temporal proximity.[24] *Roberts*, 998 F.3d at 127 ("[T]his Court has held that a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation 'is too long to establish a causal connection by temporary proximity alone.'" (quoting *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006))).

---

[24] Hayes's failure to prove causation—an essential element of her retaliation claim—for this protected activity renders the disputed facts underlying it immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Hayes's complaint about being "blackballed" presents a much closer case. Hayes raised her complaints to Almond and Byrd at the January 10, 2020 meeting, she filed a memo appealing the writeup on January 30, 2020, and Sonabank fired her on March 4, 2020. The Court finds that the one month gap between Hayes's appeal and her termination satisfies the causation prong for her complaint to Almond and Byrd. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 247 (4th Cir. 2015) (supervisor recommended plaintiff for termination less than one month after she complained of harassment); *see Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (plaintiff established prima facie case of retaliation where the adverse employment action happened six weeks after the latest protected activity).

### 2. *Sonabank's Burden of Production*

Because Hayes has met her burden of proving a prima facie case of retaliation, Sonabank must show that "it acted with a legitimate, nondiscriminatory reason." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 267 (4th Cir. 2005). Here, Sonabank explains that it fired Hayes for her poor job performance. As explained in Section III.A.1, *supra*, the Court agrees that Hayes did not meet Sonabank's legitimate performance expectations. The Court thus finds that Sonabank provided a legitimate, nondiscriminatory reason for firing Hayes.

### 3. *Hayes's Burden to Show Pretext*

Because Sonabank met its burden of production, Hayes must show that Sonabank's "articulated reason was pretext for unlawful discrimination." *Anderson*, 406 F.3d at 267 (quoting *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001)). Hayes says that Sonabank's reasons for terminating her constitute pretext because they "are without any real basis or evidence to support them." (ECF No. 36, at 37.) She also accuses Sonabank of withholding evidence,

20

tampering with evidence, creating evidence after-the-fact, and "shifting" its reasons for firing Hayes. (*Id.* at 38.)

As described in Section III.A.1, *supra*, the evidence in this case—undisputed facts, facts Hayes fails to counter with reliable evidence, and facts viewed in the light most favorable to Hayes—supports Sonabank's stated reasons for terminating Hayes. Hayes creates a fictional distinction between Sonabank's initially stated explanations of poor job performance and lack of production and its later-stated reason of "substandard performance after being repeatedly coached on how to meet Bank expectations." (ECF No. 36, at 39 (quoting ECF No. 36-57, at 22 (Sonabank's Equal Employment Opportunity Commission ("EEOC") response)).) The fact that Sonabank used different language to describe Hayes's poor performance in its EEOC response does not constitute a "shifting" reason.

Hayes also notes that, during the course of this suit, Sonabank has added to Hayes's list of misdeeds her failure to report a car accident, her failure to complete trainings, her interactions with customers, and her second job with Capital One. (*Id.*) But acknowledging this new information does not show pretext where Sonabank continues to rely on legitimate, nondiscriminatory reasons for firing Hayes—that is, her poor job performance and lack of production. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 226 (4th Cir. 2019) ("While an employer is certainly permitted to expand on its original reason for a termination, such evidence of *substantial* changes to [an employer's] proffered reason for the termination permits an inference of pretext." (emphasis added)). The Court thus finds that Hayes has not satisfied her burden of showing that Sonabank's stated reason for firing her constitutes pretext and that the true reason is retaliatory. The Court will thus grant Sonabank's motion for summary judgment on Hayes's retaliation claims under Title VII and § 1981.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant Sonabank's motion for summary judgment on Count I (unlawful termination under § 1981), Count II (retaliation under § 1981), Count III (unlawful termination under Title VII), and Count IV (retaliation under Title VII).

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 11 August 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

22